UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE PEOPLES STATE BANK, ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | 1:10-cv-1640-RLY-TAB |
| STIFEL, NICOLAUS & COMPANY, ) | |
| INC.; MICHAEL SULLIVAN, ) | |
| RONALD KRUSZEWSKI, AND JOHN ) | |
| DOE'S 1 & 2, ) | |
| Defendants. ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, The Peoples State Bank ("Peoples"), filed a Complaint against

Defendants, Stifel, Nicolaus & Company, Inc. ("Stifel"), Michael Sullivan ("Sullivan"),

Ronald Kruszewski, and John Doe's 1 & 2 (collectively, "Defendants"), alleging three

counts based upon Indiana law: (1) a violation of the Indiana Uniform Securities Act

("Indiana Securities Act"); (2) constructive fraud; and (3) breach of contract. Both sides

have moved for summary judgment with respect to all counts. For the reasons set forth

below, the court **DENIES** Peoples' motion on all counts and **DENIES IN PART and**

**GRANTS IN PART** Defendants' motion for summary judgment. As both parties have

fully briefed their positions, the court **DENIES** Defendants' request for oral argument.

**I.  Background**

**A.  Peoples' Relationship with Sullivan**

Sullivan first started conducting business with Peoples in 1982. (Deposition of

Michael Sullivan ("Sullivan Dep.") at 54:1-3, Jan. 24, 2012). Sullivan attended board of

1

directors meetings, reviewed and made recommendations regarding the existing

investment portfolio, and spoke regularly with Peoples' employees James Chesney

("Chesney") and Senior Vice President/Controller, Gary Brinley ("Brinley").  (*Id*. at

54:16 – 58:9 & 65:15-19).  Starting in 1997, Brinley made decisions about the investment

portfolio with help from Chesney and advice from Sullivan.  (Deposition of Gary Brinley

("Brinley Dep.") 7:23 – 8:7, Sept. 29, 2011).  Sullivan, Chesney, and Brinley (and later

only Sullivan and Brinley) had daily telephone conferences regarding Peoples'

investments.  (Sullivan Dep. 64:11 –  65:19 & 67:2-9).   Peoples made most of their

investments through Sullivan.  (*Id*. at 63:23 – 64:3).  Sullivan joined Stifel in 2007 and

asked Peoples to remain with him as a client, which it did.  (*Id*. at 70:17-25).

### B.  Peoples' Purchase of Auction Rate Securities

After joining Stifel, Sullivan recommended auction rate securities ("ARS") to

Peoples as it was "looking for a short term investment."  (*Id*. at 71:21 – 72:25).  ARS are

long-term debt instruments tied to short-term interest rates.  ARS have a fixed par value

and a long-term nominal maturity with interest rates that are reset via a periodic (most

often seven, twenty-eight, or thirty-five days) "Dutch Auction" competitive bid process.

The lowest interest rate bid required to sell all of an ARS issue available for sale at any

given auction is the "clearing rate" and becomes the interest rate paid to holders until the

next auction.

Between November 5, 2007, and January 4, 2008, Stifel, through Sullivan, sold

Peoples nine (9) ARS, for a combined total of $15,500,000.  (Affidavit of The Peoples

State Bank ("PSB Aff.") at ¶ 20).  All of the securities were "education guaranteed

student loan backed securities." (Brinley Dep. 35:12-19). On December 13, 2007, Peoples sold the Collegiate Funding Services ARS at a successful auction, and purchased an Indiana ARS instead. (PSB Aff. ¶ 21).

### C. ARS Market Collapse

On February 13, 2008, the ARS market froze with no bidders for the periodic auctions. (Sullivan Dep. 129:18-21). Peoples alleges that this market collapse was caused by the broker-dealers no longer supporting their own auctions. (*See* Deposition of Trisha Brase 93:4-7, Apr. 5, 2012). After the market collapse, Peoples placed an open sell order with Sullivan for all of its ARS products. (Sullivan Dep. 129:14-21). Peoples sold some of the ARS purchased from Defendants, but still holds five (5) ARS purchased from Defendants valued at approximately $8,600,000. (PSB Aff. ¶¶ 28 - 37). Of these ARS, three (3) are subordinate issues, which means the underlying collateral has been pledged to an earlier ARS issue holder with a priority over Peoples for both ARS collateral and interest payments. (*Id*. at ¶¶ 22, 37). After the market froze, Peoples' ARS reset at default rates, which were 0% for several months for both the Pennsylvania and Indiana ARS. (*Id*. at ¶ 43). If no intervening offers to repurchase occur, Peoples may be required to hold its remaining ARS to their respective dates of maturity, which range between December 1, 2040, and December 1, 2045. (*Id*. at ¶ 48).

### D. Peoples' Alleged Knowledge

Peoples claims the ARS were marketed by Defendants as liquid, investment-grade securities that could be sold at any 7- or 28-day auction rate. (*Id*. at ¶ 13). In addition, Peoples alleges that Sullivan represented ARS as safe, well-collateralized, and guaranteed

by the federal government.  (*Id*. at ¶ 14).  Peoples claims Sullivan neither mentioned the possibility of failed auctions nor provided Peoples with any prospectuses.  (*Id*. at ¶ 15).

Peoples maintains it did not access any information concerning ARS outside of what Sullivan provided.  (Brinley Dep. 38:11-17).  In particular, it did not independently obtain any information concerning the mechanics of the ARS market.  (*Id*. at 53:19 – 54:2).  Brinley, as manager of Peoples' investment portfolio, contends that at the time of purchase he knew that an ARS was a security that had its interest rate reset at an auction taking place at a specific periodic time, generally every 28 days.  (*Id*. at 14:15-22).  Further, Brinley believed ARS were very liquid and that it was possible to get out of that investment at the time of any auction.  (*Id*. at 15:3-8).  At the time of purchase, Peoples wanted to purchase an investment grade security, but the credit quality from A-rated security up to AAA was of no significance.  (*Id*. at 16:5-18).  Because of the market collapse, Peoples alleges it now has a long-term subordinate security which is neither liquid nor generating any interest payments.

### E.  Defendants' Disclosures

Defendants contend that the appropriate disclosures were made to Peoples through (1) their own disclosures; (2) publicly available information; and (3) a prospectus from another broker-dealer, Crews & Associates ("Crews").

### 1.  Defendants' Disclosures to Peoples

Defendants contend they provided to Peoples the following: (1) Bloomberg Description pages for each ARS; (2) Citigroup Capital Market ARS inventory ("Citigroup Inventories"), which disclosed characteristics of the ARS market and

4

contained ARS that Peoples purchased; and (3) Goldman Sachs and JP Morgan ARS inventories, which listed ARS available for purchase out of other broker-dealer inventories that Peoples did not purchase.  The ARS at issue were in connection with a secondary market purchase.  (Sullivan Dep. 136:18-23).  As a result, under Indiana law a prospectus was not required to be delivered upon purchase.  Ind. Code § 23-2-1-5 (requiring prospectus in connection with offering but not in connection with sales in the secondary market) (repealed and recodified as Ind. Code § 23-19-3-4); (Deposition of Thomas R. Kendrick 93:11-19, May 8, 2012).

## 2.  Publicly Available Information

Defendants also state that publicly available information provided sufficient background information about the ARS market.  In particular, the prospectuses and offering materials for each of the ARS at issue were publicly available on or before the date each was purchased.  These prospectuses disclosed the risks associated with ARS, including (1) the potential difficulty to resell notes at the time and price one desires; (2) the risk of auction failures and resulting illiquidity; and (3) the subordinate nature of the notes.  (*See* Affidavit of Michael Sullivan ("Sullivan Aff.") ¶ 17, Ex. 11).  In addition, a publicly-available 2006 Securities and Exchange Commission ("SEC") ARS Consent Order states that dealers made support bids to prevent auction failures and highlights the risk of illiquidity.  (*Id*. at Ex. 12 at 4-6).  In this Order, the SEC sanctioned investment firms for failing to disclose material information about the ARS market.  (*Id*. at 8-11).

### 3.   Prospectus from Crews

In mid-November of 2007, Peoples received a prospectus for a different ARS purchased through another broker-dealer, Crews, which disclosed the possibility of auction failures and explained that dealers bid to prevent such failures.  (Brinley Dep. 25:2-17).  All of the ARS at issue were purchased by Peoples after the receipt of this prospectus.  (*See* PSB Aff. ¶ 37).

### F.  Lawsuit

Peoples brought this lawsuit in state court seeking damages from Sullivan, Stifel, Ronald Kruszewski, who is the CEO of Stifel, as well as yet to be identified others within Stifel's organization.  The Defendants removed the case to this court based upon diversity of citizenship.  Both sides moved for summary judgment on all counts.

## II. Motion for Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A "material fact" is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  To that end, a genuine dispute as to a material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id*. at 249.  Facts must be supported by citations to the record, which includes "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1).  Further, parties may assert that "the materials cited

do not establish the absence or presence of a genuine dispute," and parties may also object to the admissibility in evidence of the material cited. *Id*. at 56(c)(1), (2). At bottom, the court construes this evidence, and draws all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). In sum, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

Here, the parties have filed cross-motions for summary judgment, but this neither alters the applicable standard nor implies there are no genuine issues of material fact. *R.J. Corman Derailment Services, LLC v. Int'l Union of Operating Engineers,* 335 F.3d 643, 647 (7th Cir. 2003). Instead, in determining whether genuine and material factual disputes exist, the parties' respective memoranda and supporting affidavits and exhibits are analyzed and all facts and reasonable inferences resolved and construed in a light most favorable to the respective non-movant. *IPofA W. 86th St. 1, LLC v. Morgan Stanley Mortg. Capital Holdings, LLC*, No. 1:09-cv-0573, 2011 WL 3021578, at *2 (S.D. Ind. July 21, 2011). Thus, when considering the plaintiff's motion for summary judgment, the court must consider the evidence in light reasonably most favorable to the defendants, and vice versa. *Midwestern Indem. Co. v. Laikin*, 119 F. Supp. 2d 831, 833 (S.D. Ind. 2000).

### III.  Discussion

### A.       Indiana Securities Act

Peoples alleges that Defendants misrepresented and omitted material information about the ARS it purchased from Sullivan, in violation of the Indiana Securities Act.  The Indiana Securities Act, codified at Indiana Code Section 23-2-1-12[1], provides in relevant part:

> It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, (1) to employ any device, scheme or artifice to defraud, or (2) *to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading*, or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

(emphasis added).  This statute differs from federal securities laws, in particular Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), in several ways. Principally, the seller's intent is not relevant in an Indiana Securities Act claim.  *Compare Manns v. Skolnik*, 666 N.E.2d 1236, 1248 (Ind. Ct. App. 1996) (a violation occurs "irrespective of the individual's intent to defraud") *with Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir. 1989) (listing elements for Rule 10b-5, including "the intent to mislead").  Instead, the central issue for violating the statute is "whether material information is either misrepresented or omitted entirely."  *Manns*, 666 N.E.2d at 1248.

Here, Peoples alleges that Defendants misrepresented and omitted material information about the ARS market generally and the ARS it purchased, in particular.  In

---

[1] After the facts giving rise to this litigation, this statute has since been repealed and re-codified as Ind. Code 23-19-5-1.

response, Defendants have raised three principle arguments against summary judgment for Peoples and in support of summary judgment for themselves: (1) Defendants did not make any false statements in connection with the sale of the ARS; (2) the alleged misrepresentations and omissions were not material to Peoples' decision to purchase ARS; and (3) the allegedly omitted information was actually disclosed to Peoples.

A central theme that runs throughout the course of the parties' arguments is whether Defendants had a duty to disclose all material information related to the ARS Peoples purchased, or whether Peoples, as an investor, had a duty to conduct its own investigation into the inherent risks associated with purchasing ARS on the secondary market.  The Indiana Court of Appeals addressed this issue in *Kelsey v. Nagy*, 410 N.E.2d 1333 (Ind. Ct. App. 1980).  Because the holding of this case is pivotal to the court's ruling, the court will begin with a brief discussion of that case.

### 1.  *Kelsey v. Nagy*

*Kelsey* involved investors alleging that the seller made several material misrepresentations and omissions in their purchase of stock.  *Id*. at 1336.  In particular, investors alleged that the seller told them they were purchasing unissued or treasury shares of stock, with the purpose of the sale to raise additional capital for expanding the company's business.  *Id*.  In reality, they were purchasing the seller's stock, a fact which he never disclosed.  *Id*.  The investors sued the seller to recover consideration paid for stock under the Indiana Securities Act, which, at the time of the transaction, read in pertinent part:

> Any person who . . . offers or sells a security by means of any untrue
> statement of a material fact or any omission to state a material fact
> necessary in order to make the statements made, in the light of the
> circumstances under which they are made, not misleading (the buyer
> not knowing of the untruth or omission), and who does not sustain
> the burden of proof that he did not know, and in the exercise of
> reasonable care could not have known, of the untruth or omission, is
> liable to the person buying the security from him . . . .

Indiana Code 23-2-1-19(a)(2).

The Court found that the source of the stock was a material fact as the buyers "had the right to know whether the money they were paying for the stock was going into the treasury of the corporation so as to increase its working capital, or into [the seller's] pocket where it would have no such effect." *Kelsey*, 410 N.E.2d at 1336. Further, the Court found the disclosure of the true source of the stock would have led to further inquiries by the investors, and thus, the failure to disclose constituted an "omission to state a material fact." *Id*.

Nonetheless, the seller argued that the buyers knew or, in the exercise of reasonable care and due diligence, could have known, of the omission. *Id*. The Court found nothing supported the buyers having actual knowledge of the omitted fact that they were buying the seller's stock. *Id*. Further, the Court rejected the proposition that the buyers "had an affirmative duty to make inquiries and discover the actual circumstances underlying the transaction." *Id*. The Court explained:

> Certainly if the legislature had intended to impose a duty of investigation
> upon the buyer, it would have expressly included such in the wording of the
> statute. The proscriptions of IC 23-2-1-19, however, embrace a
> fundamental purpose of substituting a policy of full disclosure for that of
> caveat emptor. That policy would not be served by imposing a duty of
> investigation upon the buyer.

*Id.*  In addition, the Court noted the parenthetical in the statute -- "(the buyer not knowing of the untruth or omission)" -- was an indication of "clear legislative intent" that it is not a defense to an action brought under this statute that "an investigation by the buyer might have led to the discovery of the omission."  *Id*.

With this case in mind, the court now turns to the nature of the disclosures allegedly provided to Peoples by Defendants and determines what information may be imputed to Peoples.

### 2.  Defendants' Disclosures to Peoples

Defendants argue that they disclosed the following: (1) Bloomberg Description pages for each ARS; (2) Citigroup Inventories; and (3) Goldman Sachs and JP Morgan ARS inventories.  Defendants argue this information was sufficient to disclose: (1) the subordinate nature of the ARS, (2) the possibility of auction failures, and (3) the role broker-dealers played in bidding at auctions.

### a.  Bloomberg Description pages

The Bloomberg Description pages provide a snapshot of the security on a particular date, including the investment rating and the subordinate nature of the specific ARS.  (Sullivan Dep. 107:15 – 108:5).  Defendants allege that Sullivan sent these notices for each ARS purchased by Peoples.  Peoples disputes whether these pages were actually forwarded to Peoples and whether they were sent after the ARS trades were already placed.  (*Id.* at 105:18 – 106:14; Supplemental Affidavit of The Peoples State Bank ¶ 8).

Accordingly, there is a factual dispute as to whether all pages were produced prior to Peoples' ARS purchases.

Further, even if these pages were assumed to all be in Peoples' possession at the time of sale, there is a dispute of material fact as to whether these disclosures were sufficient to disclose the subordinate nature of the ARS.  Though the Bloomberg Description pages contained a variety of information about each particular security, these pages were laden with acronyms which would require a reasonably sophisticated investor to know what exactly this information conveyed.  (*See* Sullivan Aff., Exs. 5-10).  As a portfolio manager for a bank, one may assume Brinley is one who would understand such terminology; however, that is an issue of credibility for the trier of fact to decide, not an issue that should be decided on summary judgment.  Thus, a disputed material fact exists as to whether the Bloomberg Description pages sufficiently disclosed the subordinate nature of the ARS.

### b.  Citigroup Inventories

On November 2 and 5, 2007, Sullivan sent Brinley the Citigroup Inventories which contained the ARS that Peoples purchased.  (Brinley Dep. 34:13-23 & 37:25 – 38:10 & 56:4-16; Sullivan Aff. ¶ 6 & Ex. 1).  In particular, these inventories are comprised of spreadsheets that contain information about each available ARS, including a CUSIP code (which identifies the security), security name, issue size, credit rating, reset date, effective date, next reset, frequency of auctions, and next payment date.  (Sullivan Aff., Ex. 1 at PSB099-101).  Similarly, other spreadsheets include information about tax status/state, last rate/winning rate, Blue Sky Restricted States, "Int Pay

Frequency," and "2-Nov Net." (*Id*. at PSB0103).  Below this assortment of information

about each ARS, Citigroup disclosed the following:

> You should fully familiarize yourself with the role that broker-dealers such as Citigroup Global Markets, Inc. . . . play in the auction process for auction rate securities and the limitations on the ability to resell auction rate securities.  For a discussion of those issues and of Citigroup Global Markets Inc.'s material practices and procedures with respect to auction rate securities and other special considerations affecting auction rate securities, please visit our disclosure page.

(Sullivan Aff., Ex. 1 at PSB0099).  In addition, each inventory included the following

warning: "Before investing in any auction rate security, you should read and understand

the information disclosed in the Official Statement or Prospectus with respect to that

specific auction rate security." (*Id*. at PSB0099-0102).  The location of this information

varied on each particular spreadsheet, but all were listed below many rows of information

about the ARS being offered.  In fact, this information is listed as high as the eleventh

row in some spreadsheets, but in others, a long list of available ARS pushed this

information to rows in the low 200's and as high as row 380 of the respective

spreadsheet. (*See generally* Sullivan Aff., Ex. 1).  Even more, when these disclosures are

visible, they are unremarkable.  The font is inconspicuous and the text is spread over

many columns of the spreadsheet. (*Id*.).

Defendants maintain that the Citigroup Inventories satisfied their disclosure

requirements concerning the possibility of auction failures and of broker-dealers bidding

at auctions.  In particular, Defendants point not only to the above language but also to the

reference to "visit [Citigroup's] disclosure page" for further information.

Here, an issue of fact remains whether the language on the face of the Citigroup Inventories places Peoples on notice for the possibility of auction failures and of broker-dealers bidding at auctions.  Because of the location and font size of these disclosures, there is an issue of fact as to whether Brinley, or any reasonable investor, would have viewed the disclosures.  Even assuming a reasonable investor would have reviewed them, additional issues of fact remain as to whether this was sufficient to put Peoples on notice of these ARS characteristics.

On the other hand, any information contained in the disclosure page on Citigroup's website should not be imputed to Peoples, as this would place a duty to investigate on the investor.  Peoples maintains that it neither conducted such investigation nor had any obligation to do so.  (Brinley Dep. 38:24 – 40:12).  Peoples is correct -- as examined above, an investor does not have a duty under Indiana law to investigate the actual circumstances underlying the ARS market.  *See Kelsey*, 410 N.E.2d at 1336.  As a result, any information that could be discovered by "visit[ing] [Citigroup's] disclosure page" will not be imputed to Peoples.

### c.  Goldman Sachs and JP Morgan ARS Inventories

Sullivan also sent Brinley inventories from Goldman Sachs and JP Morgan prior to Peoples' purchase of ARS.  As an initial matter, these inventories carry less weight than the Citigroup Inventories since Peoples did not actually purchase an ARS from either the Goldman Sachs Inventory or the J.P. Morgan Inventory.  However, they also contained disclosures about the ARS market, similar to the Citigroup Inventories.

For example, the Goldman Sachs Inventory is a spreadsheet with information about available ARS, such as the offered amount, credit rating, tax status, reset mode/days left, "LA, LS/ NA, NS," and Tranche Size Daycount.  (Sullivan Aff., Ex. 2). Further, at the bottom of the spreadsheet is the following: "A written description of our material auction practices and procedures for auction rate securities is available at http://www.gs.com/ars (hard copy available upon request)."  (*Id.*).  Though it is not clear how conspicuous this statement appeared in the inventory, this disclosure, notably, is located on "Page 9 of 9" and is not set apart in any manner.  (*Id.*).  Indeed, the text is in small print across several spreadsheet columns.  (*Id.*).

Likewise, the JP Morgan Inventory is a spreadsheet of information for available ARS, including amount offered, CUSIP code, auction period, credit ratings, Tax Status, State, Last Reset, Next Reset, and Offered Rate.  (*Id.* at Ex. 3).  In addition, each page of the J.P. Morgan Inventory contained the following:

> JPM may submit orders in auctions for its own account.  In submitting such an order, JPM will have an advantage over other bidders in that it has knowledge of other bids in that auction . . . JPM may also bid in order to prevent a failed auction, an all hold auction, or a clearing rate that JPM believes is an off-market rate . . . JP Morgan's auction practices and procedures are available at www.jpmorgan.com/muniars or upon request.

(*Id.* at PSB0155).  In contrast to the Citigroup Inventories and Goldman Sachs Inventory, this disclosure appeared at the bottom of each page of the inventory offerings, not just after the last security for each particular spreadsheet.  (*Id.* at PSB0155-0159).  Thus, the reader would not have to scroll down to the end of the inventory list, but instead the disclosure would be more visible.  (*Id.*).  That said, the font size of the disclosure was

smaller than the type of the rest of the inventory and the type stretches across several spreadsheet columns.  (*Id*.).

These inventories also impose on Peoples a duty to investigate that does not exist under Indiana law.  *See Kelsey,* 410 N.E.2d at 1336.  For example, the website links to further disclosures clearly require further investigation, so this information cannot be imputed to Peoples without further evidence.  And again, Peoples asserts that it made no such review.  (Brinley Dep. 41:8 – 42:7).  Second, it is not clear from the evidence how conspicuous these disclosures were within the inventories.  If an extensive search for the disclosures is required, then that may create a duty to investigate for the investor.  To that end, the degree to which they are readily apparent to the investor goes towards the weight given to the disclosure and that is an issue for the fact-finder.

Next, even assuming Peoples had knowledge of these disclosures (which is disputed), it remains a disputed material fact whether these disclosures were sufficient to put Peoples on notice of auction failures, illiquidity, and the role of broker-dealers.  As noted above, the Goldman Sachs inventory merely mentions that its auction practices and procedures are available on another website.  The JP Morgan inventory alerts the investor of JP Morgan's auction practices and procedures, including its practice of placing bids to prevent auction failures.  However, the disclosure is ambiguous as to whether JP Morgan's practice is an accepted practice of all ARS broker-dealers, or whether this practice is limited to JP Morgan's broker-dealers.  Given the limitation of these disclosures, there is a disputed issue of fact as to whether these inventories would alter the total mix of information available to a reasonable investor.

16

### 3.  Material Omissions or Misrepresentations

Based on the information Defendants provided to Peoples, the court now turns to whether the Defendants omitted or misrepresented material information to Peoples regarding ARS.  In making this determination, the court views the evidence objectively, and examines whether a reasonable investor would have considered the information important in making an investment decision.  *Pippenger v. McQuik's Oilube, Inc.,* 854 F. Supp. 1411, 1425 (S.D. Ind. 1994).  In this context, information is material if there is a "substantial likelihood that the disclosures of the misstatement or the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information available."  *Carroll v. J.J.B. Hilliard, W.L. Lyons, Inc.,* 738 N.E.2d 1069, 1077 (Ind. Ct. App. 2000) (internal quotations and citation omitted).  The rule implicitly precludes basing liability on circumstances that arise after the speaker makes the statement.  *See Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1332 (7th Cir. 1995) (reaching same conclusion for Rule 10b-5 claims based on same language and noting "securities laws typically do not act as a Monday Morning Quarterback"); *see also Pommer v. Medtest Corp.,* 961 F.2d 620, 625 (7th Cir. 1992) (finding statements "must be assessed at the time [they] are made, and not in the light of hindsight").   In deciding these motions, "[s]ummary judgment is appropriate only if reasonable minds cannot differ on the issue of materiality."  *Tannebaum v. Clark*, No. 88 C 7312, 1994 WL 91969, at *1 (N.D. Ill. Mar. 21, 1994) (citation omitted).

### a.  Alleged Material Omissions

Peoples alleges that Defendant made several material omissions about ARS, principally failing to notify Peoples: (1) of the possibility of auction failures; (2) of the presence of broker-dealer bids which created an "artificial" market; (3) that the ARS purchased were subordinate issues; and (4) of the probability of the ARS market collapsing.

### i.    Auction Failures

Brinley testified that he did not know of the possibility of an auction failure prior to Peoples' purchase of ARS in November and December of 2007.  (Brinley Dep. 28:18-24).  Brinley also testified:

> **Q: Had you been aware of [the possibility of auction failures], would it have affected your decision on behalf of the bank to purchase the auction rate securities?**
>
> A: No because my understanding as of that point in time, the number of failures that occurred over the life of auction rate securities were minimal at best.
>
> **Q: And when did you obtain the understanding that the number of auction rate failures were minimal at best?**
>
> A: I would say sometime in January of 2008.
>
> **Q: When in January of 2008?**
>
> A: Sometime in the middle of . . . January, possibly early February, in conversations with Mr. Sullivan.
>
> **Q: Outside of talking with Mr. Sullivan, did you obtain any information as to the number of auction failures in the auction rate securities market before the market collapse in February of 2008?**
>
> A: There is a number that's rolling around of like 48 auction failures in 20 years.

(*Id*. at 28:25 - 29:21).  Based on this testimony, Defendants argue this characteristic

cannot be material since it would not have affected Peoples' decision to purchase ARS.

Brinley, however, further testified:

> **Q: . . . Did Mr. Sullivan tell you in October or November 2007**
> **time frame when you first started purchasing ARS that there**
> **could be an auction failure?**
>
> A: He did not.
>
> **Q: And had he given you that information, would it have**
> **affected your decision to purchase ARS?**
>
> A: It could have.

(*Id*. at 200:13-23).

This information may have forced a reasonable investor like Brinley to re-evaluate

the risk in selecting ARS, especially in light of the fact that Peoples was looking for a

short-term investment, but it is not clear from Brinley's testimony to what extent this

would have altered the total mix of information available.  Accordingly, it is a disputed

material fact whether Defendants' alleged failure to disclose the risk of auction failures

was material.

### ii.    Broker-Dealer Bids

Brinley testified that he was not aware in November 2007 that underwriters of

certain ARS were placing bids at auction in order to prevent auction failures.  (*Id*. at

27:20 – 28:3).  Brinley also stated, though, that he "would have probably assumed that

[broker-dealers] . . . may put in orders for their own accounts but would not have . . .

relied upon that."  (*Id*. at 26:20-25).  Defendants argue this testimony is evidence that

such knowledge would not have played a role in Peoples' decision to purchase ARS.  But the simple assumption that broker-dealers may submit bids does not equate to knowing that dealers allegedly submitted bids in order to prevent failed auctions and maintain the appearance of a liquid ARS market.  Thus, there is a disputed material fact whether Peoples knew the extent and importance of broker bids upon entering the sale, and thus the materiality of this characteristic remains in dispute.

### iii.    Subordinate Issues

Brinley testified that at the time of purchase he "probably did not" understand that the code "S-U-B-O-R" in the Citigroup Inventory meant that the issue was a subordinate issue because he "was not, at the time that [Peoples] made the acquisition, understanding that the issues were subordinate issues" and Sullivan did not tell him the issues were subordinate.  (*Id*. at 54:13 – 55:2 & 57:8-18 & 58:8-13 & 59:23 – 60:8).  Peoples also argues the Bloomberg Description pages did not put Brinley on notice of the subordinate nature of the ARS because Brinley was "not focused on [the SUB code] at the time" of the purchase.  (*Id*. at 64:10 – 65:2).  Defendants respond that Peoples should have known of ARS' nature through not only the Bloomberg Description pages but also the ARS inventories.

As discussed above, the Bloomberg Description pages and Citigroup Inventories contained a variety of information about the ARS, but there is a material issue of fact as to whether a reasonable investor would understand this information and thus be sufficiently put on notice that the ARS were subordinate issues.  *See Crook v. Shearson Loeb Rhoades, Inc.*, 591 F.Supp. 40, 49 (N.D. Ind. 1983) (holding investor "had no

20

affirmative duty to discover that he did not actually understand what had been explained to him about commodities or that there was more to the commodities area which had not been explained").  As a result, there is a disputed fact as to whether this information was in fact omitted.

That said, the court still must determine whether this fact was material in order to be actionable.   Here, because ARS were subordinate issues, the underlying collateral had already been pledged to an earlier ARS issue holder who had a priority of claim over both ARS collateral and interest payments.  (PSB Aff. ¶ 22).  As a result, this allegedly omitted information may have altered the mix of information for a reasonable investor, but it is not clear at this time to what extent.  Thus, a disputed fact exists over the materiality of this alleged omission.

### iv.    ARS Market Collapse

According to Peoples, Defendants misled them about the stability of the ARS market because Defendants allegedly had in their possession the following information which signaled an imminent market collapse: (1) Richard Kendrick, a member of Stifel's board of directors, recalled observing auction failures in November 2007; (2) another ARS was at the risk of failing and instead waived its maximum rate in December 2007; (3) internal emails at Stifel discussed the "market color" for ARS, auction failures, and the risks associated with them; and (4) Fitch Ratings – a well-known ratings agency – issued a press release noting recent waivers of maximum rates by issuers and concerns about the student loan backed ARS market.  Defendants deny knowledge of the Fitch

press release, but do not dispute knowledge of (1), (2), or (3).  Instead, they argue such grand sweeping predictions were not possible from these indicia alone.

Though the court is hesitant to place an expectation on Defendants to predict the future of a market, Peoples has satisfied its burden of showing a material fact exists concerning whether there were sufficient indicia of the ARS market's imminent fall to require disclosures.  Thus, there remains a material disputed fact whether Defendants' failure to disclose information about an imminent market collapse is a material omission of fact.

### b.  Alleged Material Misrepresentations

Peoples alleges that Defendant made several material misrepresentations about ARS, principally that ARS were: (1) a liquid, short-term investment; (2) safe and well-collateralized; and (3) investment-grade.

### i.    Liquidity/Short-Term Investment

Brinley testified that he "did not have any understanding of any liquidity risk based upon the comments from Mr. Sullivan that we could sell the auction rate securities at any time at an auction, and they were liquid, almost like cash."  (Brinley Dep. 30:16-23).  Brinley maintained he did not understand the potential for a liquidity risk until February of 2008 when the ARS market collapsed.  (*Id*. at 31:4-11).  Defendants argue that the ARS market functioned for many years with only isolated auction failures.  (*See id*. at 29:15-24).  The evidence does not, however, show the extent these broker-dealer bids upheld the market or created any false appearance of liquidity.  As a result, there is a

question as to whether this was a misrepresentation; in particular, whether the market was in fact liquid when ARS were sold or if it was only artificially liquid due to broker bids.

Next, the court examines whether this alleged misrepresentation is material. Peoples contends that if it knew of ARS' actual liquidity, it either would not have purchased any ARS or would have significantly limited its purchase. Indeed, Sullivan even conceded that Peoples was "looking for a short term investment." (Sullivan Dep. 72:15-25). Defendants contend Peoples was aware that ARS were not liquid at all times, so this defeats its argument that liquidity was material. The court disagrees. Peoples' acknowledgement that ARS did not have absolute liquidity does not reduce the materiality of this characteristic -- a vast spectrum exists between absolute liquidity and long-term illiquidity. Peoples' acceptance of potential illiquidity on seven to thirty-five day increments does not transform into conceding liquidity for over thirty-eight years – with the date of maturity for one ARS that Peoples still holds as far off as December 1, 2045. (PSB Aff. ¶ 48). Instead, Peoples' desire to be able to sell the issues in relatively short time periods displays its desire to have a liquid, short-term investment. Accordingly, the materiality of ARS being a liquid, short-term investment is a disputed material question of fact.

### ii.    Safe/Well-Collateralized

Peoples argues that Sullivan misrepresented that ARS were "safe," "well-collateralized," and "represented student loan receivables guaranteed by the federal government." (PSB Aff. ¶ 14). Representations of this sort are too vague and imprecise to qualify as material. *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir.

2011) (alleged misrepresentation that ARS were "safe" was not actionable because it was too vague to qualify as material); *see also Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (stating "predictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and Rule 10b-5"). Though *Ashland* and *Searls* are not controlling, the court agrees with their rationale.

In addition, Brinley admitted these statements accurately reflected the market at the time they were made. (Brinley Dep. 45:24 – 46:20). Representations are evaluated "in light of the circumstances under which they were made." Ind. Code 23-19-5-1. It has no bearing on Peoples' claims that the stability of the ARS market faltered after Peoples' purchase. Accordingly, these terms are not actionable.

### iii.    Investment-grade

Similarly, Peoples argues that Sullivan misrepresented the ARS purchased as "investment grade." All of the ARS purchased by Peoples were rated "A" or higher at the time of purchase. (Brinley Dep. 33:5-15 & 37:18-22). Brinley testified this was true at the time of purchase. (*Id*. at 45:4-23). Again, it is inconsequential that the rating may have changed *after* Peoples purchased the ARS, and thus, Defendants' representation that ARS were "investment grade" is not actionable.

### 4.  Disclosures by Non-Parties/Publicly Available Information

Finally, Defendants maintain that even if their own disclosures were not sufficient, the disclosures were not material because the information was already revealed to Plaintiff through a combination of prior disclosures by another broker-dealer and through

publicly available information.  In particular, Defendants point to (1) a prospectus for a different ARS purchased through Crews; (2) the prospectuses and offering materials for each of the ARS at issue, which were publicly available on or before the date each was purchased; and (3) the publicly available 2006 SEC ARS Consent Order.

For reasons previously explained, disclosures from other sources may not be imputed to Peoples.  *Kelsey v. Nagy* controls here despite Defendants' arguments that (1) the case has been overruled; (2) the case is not applicable here; (3) the case's application would contravene public policy; and (4) cases citing a duty to read are applicable instead.

### a.      *Kelsey* Remains Good Law

First, Defendants argue that the rationale underlying *Kelsey* is no longer applicable in light of amendments to the Indiana Securities Act subsequent to *Kelsey*.  Notably, Defendants fail to cite any case law for this proposition.  Because Indiana state courts have yet to acknowledge any grand sweeping changes in this area – nor is it a federal court's place to make such major changes in state law when sitting in diversity – *Kelsey* remains good law on this issue.  As the *Kelsey* Court noted, the legislature could have expressly included a duty to investigate or exercise due diligence in the statute. Significantly, the amendments did not add such a duty; accordingly, the court will not read one into the statute.

### b.      *Kelsey* Is Applicable

Next, Defendants argue that *Kelsey* is not on point here because Peoples did not have to conduct an investigation to discover information because it actually possessed the material information via the Crews prospectus and other publicly available information.

25

Even if Peoples were assumed to (1) possess documents from another broker-dealer which shed light on these alleged omissions and misrepresentations, and (2) have access to publicly available information that would do the same, imputing this knowledge to Peoples to absolve Defendants' alleged failure to disclose goes against Indiana's policy of full disclosure.  Indeed, as this court previously noted, "[s]uch an expectation [to make itself aware of the information available to it] is the essence of a duty to investigate, a duty which the Court of Appeals in Indiana has rejected with respect to the application of the state's anti-fraud provisions for the sale of securities."  *Peoples State Bank v. Stifel, Nicolaus & Co., Inc.,* 1:10-cv-1640, 2011 WL 4537024, at *4 (S.D. Ind. Sept. 28, 2011).  Accordingly, Peoples had no duty to investigate under Indiana law.

> **c.      Application of *Kelsey* Supports Public Policy**

Notwithstanding *Kelsey*, Defendants contend that permitting Peoples to ignore publicly available documents and the Crews prospectus contravenes the purpose of the Indiana Securities Act to promote a policy of full disclosure and renders the Act meaningless.  When "construing an Indiana statute, [the court's] duty is to ascertain and give effect to the legislative intent."  *Manns*, 666 N.E.2d at 1248.  Here, the "legislative intent was to regulate the information which must be disclosed in connection with a security transaction.  The statute requires that material information be disclosed . . . [and] turns entirely on whether the information disclosed was accurate, if disclosed at all.  If material information is either misrepresented or omitted entirely, then the statute has been violated."  *Id*.

By application, the legislature did not intend to permit broker-dealers to escape liability because actionable disclosures were serendipitously received from another source.  The dangerous slippery slope this would create is apparent – investors would be on notice for information they received from any broker, for any security, at any time.  A far simpler rule, the rule promulgated by the Indiana legislature, is to require brokers to disclose all material information to a prospective investor.  This encourages brokers not to assume an investor's knowledge or access to information, but instead err on the side of disclosing any and all risks.  That is precisely what the legislature intended when deciding to distance itself from the policy of caveat emptor.  *See Kelsey*, 410 N.E.2d at 1336.  Thus, *Kelsey*'s application is supported by public policy.

### d.   Duty to Read Cases are Not Applicable to Disclosures by Outside Sources

Finally, Defendants contend that the prospectus from Crews and publicly available information should still be imputed to Peoples because it had a duty to read these materials.  Defendants point to federal securities laws concerning a duty to read documents in Peoples' possession, even documents Defendants did not provide.  While the Indiana Supreme Court noted that "in many cases federal authority is appropriate in interpreting the standards required by state securities law," it also noted that "many state securities laws antedate the Securities Act of 1933 and provide more rigorous standards for the offer and sale of securities than does the federal regime."  *Lean v. Reed*, 876 N.E.2d 1104, 1108-09 (Ind. 2007) (citation omitted).  To that end, the Court points out

that "[f]ederal authority does not provide useful guidance on points where there are important differences between the state statute and its federal counterparts." *Id*. at 1009.

Here, the federal case law cited by Defendants is not helpful.  Defendants cite *Acme Propone, Inc. v. Tenexco, Inc.* for the proposition that a "seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires."  844 F.2d 1317, 1322 (7th Cir. 1988).  *Acme Propone* not only involves federal securities and Illinois state law claims, but also contains facts not present here.  Indeed, Peoples alleges that Defendants have not fully disclosed all material information; instead, Defendants are trying to piggy-back off disclosures made by someone else.

Unlike federal case law, the Indiana Securities Act remains silent on the duty to read.  Even so, the underlying policy of full disclosure should be considered here, too.  The Act principally requires broker-dealers to disclose all material information.  It would contravene this policy if a broker were able to escape this requirement through another's disclosures.  Thus, the federal case law is neither helpful nor applicable to the duty to read materials provided by an outside source.

Further, the Defendants' reference to Indiana state court decisions on the "failure to read" arise in the context of contract and product disclosures.  *See, e.g. Skrypek v. St. Joseph Valley Bank*, 469 N.E.2d 774, 779 (Ind. Ct. App. 1984); *Robert's Hair Designers v. Pearson*, 780 N.E.2d 858, 869 (Ind. Ct. App. 2002); *Ford Motor Co. v. Rushford*, 845 N.E.2d 197, 202 (Ind. Ct. App. 2006); *Cook v. Ford Motor Co.*, 913 N.E.2d 311, 326 n.82 (Ind. Ct. App. 2009).  These cases deal with parties in privity or some other kind of

relationship with each other.  In other words, such disclosures were made or provided by the defendant, and the defendant relies on plaintiff's duty to read this information.  No such relationship exists here as Defendants point to disclosures made by *another* broker-dealer concerning *different* ARS than those at issue here.  Accordingly, the prospectus from Crews will not be imputed to Peoples.

### 5.  Conclusion

In sum, questions of fact exist as to whether material information has been omitted or misrepresented and whether Peoples had actual knowledge of such information. [2]  For purposes of this motion, the court only considered the disclosures made by Defendants.  However, evidence as to publicly available information and other information in Peoples' possession at the time of purchase may be relevant at trial.  Accordingly, both motions for summary judgment with respect to the Indiana Securities Act claim are denied.

### B.    Constructive Fraud

Both parties have also moved for summary judgment on Peoples' claim for constructive fraud, and both agree that this claim is intertwined with the Indiana Securities Act claim.  The elements of constructive fraud under Indiana law are: (1) a

---

[2] Defendants argue that Peoples' status as an institutional investor alters this analysis, but Defendants fail to point to any Indiana case law for this principle and instead cite federal case law, which is not controlling here.  Defendants' reliance on federal case law is misplaced because Indiana law does not apply a different standard for institutional investors.  Indeed, the legislative text provides guidance that no distinction should be made.  The Indiana Code defines a "person" as referenced in the Indiana Securities Act as an "individual, corporation, . . . limited liability company, . . . public corporation, or any other legal or commercial entity."  Ind. Code 23-19-1-2(20).  Even more telling, the Code also defined "institutional investor," yet declined to differentiate between a "person" or "institutional investor" in the statute at issue here.  Ind. Code 23-19-1-2(11); *see* Ind. Code 23-19-5-1.  As a result, the court does not see any clear legislative intent to hold institutional investors to a different standard.

duty owing by the party to be charged to the complaining party due to their relationship;
(2) violation of that duty by the making of deceptive material misrepresentations of past
or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by
the complaining party; (4) injury to the complaining party as a proximate result thereof;
and (5) the gaining of an advantage by the party to be charged at the expense of the
complaining party. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). Stated
differently, constructive fraud arises by "operation of law when there is a course of
conduct which, if sanctioned by law, would secure an unconscionable advantage,
irrespective of the actual intent to defraud." *Yeager v. McManama*, 874 N.E.2d 629, 641
(Ind. Ct. App. 2007) (citation omitted).

Here, Defendants argue that their disclosures, Crews' disclosures, and publicly-
available information, preclude a claim of reasonable reliance and defeat Peoples' claim.
Peoples contends its reliance on Sullivan's disclosures was reasonable based on their
long-standing relationship.

Whether Peoples may reasonably rely on the advice of Sullivan goes beyond their
relationship, though. As Defendants argue, the relevant inquiry is whether Peoples was
reasonable to rely on Sullivan when it allegedly had actual knowledge, imputed
knowledge, or public knowledge of the alleged misrepresentations or omissions. As
discussed above, at this stage there are conflicting inferences that can be drawn from the
evidence as to Peoples' actual knowledge and what Defendants provided. As a result,
there is a material question of fact whether it was reasonable for Peoples to rely on
Sullivan. *See LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, 722 F.

Supp. 2d 1015, 1030 (N.D. Ind. 2010) (finding that "gauging the reasonableness of the Plaintiffs' reliance is a highly fact specific inquiry that does not lend itself to summary judgment"). Accordingly, summary judgment cannot be granted.

### C.    Breach of Contract

Both parties move for summary judgment with respect to Peoples' claim for breach of contract. The essential elements for a breach of contract claim are: (1) the existence of a contract; (2) the defendant's breach thereof; and (3) damages. *Hopper v. Colonial Motel Properties, Inc.*, 762 N.E.2d 181, 187 (Ind. Ct. App. 2002).

Peoples alleges that in mid-February of 2008, it placed an open sell order with Defendants for all of its ARS, but Defendants failed to execute such orders. (Sullivan Dep. 129:14-21). Peoples contends that these instructions constituted a contract, and Defendants' alleged inaction was a breach. (Complaint ¶¶ 91-94). Defendants, however, state that even if Peoples can establish an instance where ARS were not offered for sale at auction (a point which they have not conceded), this claim fails because there is no evidence of successful auctions since mid-February 2008 for any of the ARS that Peoples still holds; as a result, it cannot establish damages. (*See* Affidavit of Edward Poth ¶ 10). The court agrees. Peoples cannot establish damages without a successful auction and thus, its claim fails.

Peoples, somewhat remarkably, responds that damages do exist because Defendants failed to designate any evidence establishing that Peoples has *not* suffered damages. This misstates the law. A defendant does not have the burden to show a lack of damages in a breach of contract claim; rather, the plaintiff has the burden to prove

damages exist.  *Indiana Bureau of Motor Vehicles v. Ash, Inc.,* 895 N.E.2d 359, 368 (Ind.

Ct. App. 2008) ("The burden of proof with respect to damages [in a breach of contract

claim] is with the plaintiff").  Plaintiff has failed to do that here as it does not designate

any evidence representing damages stemming from this alleged breach of contract.

Instead, Peoples only assumes that damages must have occurred even though Brinley

confirmed he did not have any conclusive proof that ARS held by the bank had been sold

at auction by other investors.  (Brinley Dep. 100:8-13).  Pure speculation is not enough to

survive summary judgment.  *Slowiak*, 987 F.2d 1293, 1295 (7th Cir. 1993) (affirming

summary judgment for defendant and concluding that a "plaintiff's speculation is not a

sufficient defense to a summary judgment motion") (citation omitted).  Accordingly, this

claim is dismissed.

### D.    Conclusion

Peoples' motion for summary judgment (Docket # 73) is **DENIED**.  Defendants'

motion for summary judgment (Docket # 86) is **DENIED IN PART** and **GRANTED IN**

**PART**.  Peoples' breach of contract claim is dismissed, but the Indiana Securities Act

and constructive fraud claims remain.  Accordingly, Defendants' motion for oral

argument on the summary judgment motions (Docket # 100) is **DENIED**.

**SO ORDERED** this 14th day of March 2013.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record