UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THE PEOPLES STATE BANK, )<br>    Plaintiff, )<br>)<br>  vs. )<br>)<br>)   1:10-cv-1640-RLY-TAB<br>STIFEL, NICOLAUS & COMPANY, )<br>INC., MICHAEL SULLIVAN, )<br>RONALD KRUSZEWSKI, AND JOHN )<br>DOES 1 & 2, )<br>    Defendants. ) | |

**ENTRY ON PLAINTIFF'S MOTION TO EXCLUDE EXPERT
TESTIMONY OF BRIAN C. UNDERWOOD**

This matter arises out of the sale of auction-rate securities ("ARS") to The Peoples State Bank ("Peoples") by Stifel, Nicolaus & Company, Inc., Michael Sullivan, Ronald Kruszewski, and John Does 1 & 2 (collectively, "Defendants"). Peoples moves to exclude the testimony of Defendants' expert, Brian C. Underwood ("Underwood"). For the reasons set forth below, the court **DENIES IN PART** and **GRANTS IN PART** Peoples' motion.

    **I.    Background**

Peoples filed this action in the Monroe Circuit Court on November 18, 2010. Peoples alleged three counts based upon Indiana law: (1) a violation of the Indiana Uniform Securities Act ("Indiana Securities Act"), (2) breach of contract, and (3) constructive fraud. On March 14, 2013, this court granted summary judgment for Defendants on the breach of contract claim but denied summary judgment for both parties on the Indiana Securities Act and constructive fraud claims.

1

On December 16, 2010, Defendants filed their notice of removal from state court. On July 2, 2012, Defendants disclosed the Expert Report of Brian C. Underwood ("Underwood Report").  The Underwood Report provided expert analysis regarding (1) the ARS market and (2) Defendants' performance of their duties and responsibilities as broker-dealer and associated persons of a broker-dealer as those duties and responsibilities relate to Peoples' allegations.  (Underwood Report at 8).  In sum, Underwood's principle conclusions include:

- The auction failures that occurred in the week of February 11, 2008 were not reasonably foreseeable by Stifel and its associated persons.

- In connection with the investment recommendations that are the subject of this case, Stifel and its associated persons complied with all applicable securities industry laws, rules, and regulations, met regulatory expectations and acted consistently with the customs and practices in the financial services industry in all material respects.

- The disclosures made by Stifel and the information otherwise provided to and/or available to Plaintiff with respect to the investments at issue were full, fair, complete, not misleading, and complied with applicable securities laws, rules, and regulations, and were consistent with the customs and practices in the financial services industry in all material respects.

- The information available to Plaintiff was sufficient to permit Plaintiff to independently evaluate the investment risk of the investments at issue.

- The policies, procedures and supervisory systems developed and implemented during the relevant time frames by Stifel were reasonably designed and reasonably implemented by Stifel and its associated persons to achieve compliance with applicable securities laws, rules, and regulations, and were consistent with the customs and practices in the financial services industry in all material respects.

(*Id.* at 8-9). Peoples challenges the reliability, relevance, and alleged legal conclusions made in the Underwood Report. Defendants respond with three principle arguments: (1) the motion ignores Underwood's extensive securities industry knowledge and experience; (2) the motion disregards theories pled in Peoples' Complaint and asserted in Peoples' Motion for Summary Judgment; and (3) the motion ignores the standard set forth in the Federal Rules of Evidence which permits an expert to offer opinions as to facts underlying ultimate issues in the case.

## II. Discussion

Federal courts exercising diversity jurisdiction apply state law to substantive issues, but the admissibility of expert testimony in diversity suits is governed by the Federal Rules of Evidence. *Stutzman v. CRST, Inc.,* 997 F.2d 291, 295 (7th Cir. 1993). The court will evaluate the proposed testimony under Rules 702 and 704 of the Federal Rules of Evidence ("Rule 702" and "Rule 704," respectively).

### A. Rule 702

The admissibility of expert testimony is governed by Rule 702 and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Smith v. Ford Motor Co.,* 215 F.3d 713, 717-18 (7th Cir. 2000). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

3

FED. R. EVID. 702.

The Supreme Court interpreted this rule in *Daubert* to require that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "In other words, as a threshold matter, 'a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue.'" *Smith*, 215 F.3d at 718 (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000)). At bottom, "[t]he fundamental purpose of this gatekeeping requirement 'is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 932 (N.D. Ind. 1999) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The Seventh Circuit employs a two-step analysis in evaluating expert testimony under Rule 702: "first, the court must determine whether the expert's testimony is reliable, and second, the court must determine whether the expert's testimony is relevant." *Id.* at 932-33 (citations omitted).

### 1. Reliability

In determining the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert used in reaching his conclusions. *Smith*, 215 F.3d at 718. In

other words, the fundamental purpose is to "rule out subjective belief or speculation." *Comer*, 63 F. Supp. 2d at 933 (citations omitted).

### a. Qualifications

An expert may be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Because "'there are many different kinds of experts, and many kinds of expertise,' the reliability analysis may also focus on whether the expert's opinion has a reliable basis in the knowledge and experience of the relevant discipline." *Citizens Ins. Co. of the Midwest v. LG Electronics USA, Inc.*, No. 3:11-cv-40, 2012 WL 3294962, at *2 (Aug. 10, 2012) (quoting *Kumho*, 526 U.S. at 150). While extensive academic and practical expertise in an area may qualify a potential witness as an expert, "Rule 702 specifically contemplates the admission of testimony by an expert whose knowledge is based on experience." *Smith*, 215 F.3d at 718 (citations omitted). In fact, "the Advisory Committee notes to Rule 702 specifically note that '[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony.'" *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) (citing FED. R. EVID. 702, 2000 advisory committee note). As a result, "a court should consider an expert's full range of practical experience as well as academic or technical training when determining whether the expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718.

In this case, Peoples argues that Underwood's experience alone is not sufficient to qualify him as an expert. Underwood's experience includes, chiefly, twenty-five years in the broker-dealer and investment advisory industry; work from 1989 to 2008 as Chief

Compliance Officer of A. G. Edwards & Sons, Inc., which later merged with Wachovia Securities, LLC; various committees and working groups in the compliance area; and service in various capacities in the financial services industry to develop compliance best practices. (Underwood Report at 2-4). Nonetheless, Peoples states that Underwood has failed to explain how this experience leads to the conclusions reached and why his experience is a sufficient basis for those opinions. At bottom, Peoples argues that Underwood's opinions are based on subjective belief and unsupported speculation and thus do not meet the standards of "intellectual rigor."

Though Underwood's qualifications will undoubtedly be addressed in cross-examination, they are sufficient to survive the court's gate-keeping function. Underwood clearly has a large breadth of experience in the securities sector in general and the compliance area in particular. While the methods and data on which Underwood bases his opinions may be limited, "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

*Metavante* provides guidance on this issue. There, a consultant with experience in financial services technology was tendered as an expert in "service levels performance and measurements in the financial services industry as well as the performance of financial technology services agreements." *Id*. at 760. The expert then testified about whether the party performed its services in a commercially reasonable manner. *Id*. Because the district court failed to properly perform a *Daubert* analysis on the testimony, the appellate court conducted a de novo review. *Id*. The Seventh Circuit held that based

6

upon the expert's experience in the financial sector, including management of a fifty-person development team, he could assist the court in assessing the company's performance of technological services. *Id*. at 761-62. At its core, the expert "testified that he was familiar with the manner in which financial services firms have evaluated technological innovations in the past and suggested that the same perspective was appropriate [there]." *Id*. The court found this testimony reliable and admissible. *Id*. at 762.

Similarly, Underwood has extensive experience in the broker-dealer and investment advisory industry, particularly compliance, and may properly evaluate the actions of Defendants and Peoples based on this experience. *See also Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.,* 493 F.3d 782, 788 (7th Cir. 2007) (finding testimony of experts in construction industry sufficiently reliable because it was based on specialized knowledge, not subjective beliefs or speculations). Underwood's duties as Chief Compliance Officer – a position he held approximately nineteen years -- included "stay[ing] abreast of the laws, rules, regulations and guidance governing the conduct of the securities, commodities, insurance and trust services the firms provided" and "develop[ing] policies and procedures to govern the firms' conduct of that business." (Underwood Report at 2). This experience – and his other years in the broker-dealer industry – provides Underwood a sufficient foundation to testify as an expert witness. Accordingly, Underwood is qualified to evaluate the ARS market generally and, in

7

particular, Defendants' performance of their duties and responsibilities as broker-dealer as they relate to Peoples' allegations.

### b. Methodology

Of course, the court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. "Even a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Smith,* 215 F.3d at 718 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999)). This step focuses on the expert's methodology. *Id*. In particular, an "expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff -- deploying neither data nor analysis – is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc*., 217 F.3d 919, 924 (7th Cir. 2000) (citations omitted).

That said, "[i]t is not the trial court's role to decide whether an expert's opinion is correct," but it is instead "limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith*, 215 F.3d at 719. Indeed, "[t]he question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Id*. (citing *Walker*, 208 F.3d at 589-90). This is because "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the

8

trier of fact." *Id.* at 718 (citing *Daubert*, 509 U.S. at 595) ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate")).

*Daubert* listed the following factors to guide district courts in assessing an expert's methodology:

> (1) Whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has been met with general acceptance.

*Daubert*, 509 U.S. at 593-94. This list does not, however, establish a definitive checklist for evaluating expert testimony. *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000) (citations omitted). Instead, a district court should use "the *Daubert* factors as a point of departure, [but the court is free to] fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it." *Conn*, 297 F.3d at 556. These factors apply "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, 526 U.S. at 141 (citing FED. R. EVID. 702).

In this case, Peoples argues that there is neither any data or methods underlying any of Underwood's opinions nor any link between his opinions and any evidence or data in the case. Defendants contend that Underwood applied his experience to the case after reviewing various case materials along with market data, industry specific rules, statutes, and relevant publications. Particularly, Underwood identified which disclosures put Peoples on notice for certain traits of the ARS market. (Underwood Report 17). In addition, Underwood estimated the auction failure rate for the period between 1984 and

9

2007 by extrapolating numbers for a subset of auctions across the whole market. (Deposition of Brian Underwood 38:3 - 41:17, July 19, 2012).

Because Underwood relies principally on his twenty-five years of experience in the industry, the *Daubert* factors are not very helpful here. *See Kumho*, 526 U.S. at 141 (stating "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case"). It appears the only statistical analysis conducted involves the extrapolated figures for auction failure rates during the relevant time period. As a result, Underwood's Report cannot be solely evaluated by the *Daubert* factors, but instead "the relevant reliability concerns . . . focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 150.

Although Underwood's statistical analysis may be replicated and evaluated, nothing has been established as to the error rate, peer review, or standards controlling this technique. Nothing in the record, however, suggests that Underwood's Report is scientifically invalid or that it will not assist the trier of fact. At bottom, though it is close, Peoples' arguments ultimately "do not go to admissibility but to the appropriate weight that should be accorded to the evidence." *Metavante*, 619 F.3d at 762. Any weaknesses in his testimony can be addressed through cross-examination, not exclusion. Hence, if Peoples believe that Underwood's methodologies and conclusions are not credible, then "[v]igorous cross examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; *see also Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not

10

supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." (citation omitted)). Accordingly, Underwood's Report survives this analysis for Rule 702.[1]

### 2. Relevancy

Next, the court addresses the relevance of the proposed testimony. Specifically, the court must ensure that the evidence or testimony will "assist the trier of fact to understand the evidence or determine a fact in issue." *Daubert*, 509 U.S. at 591 (citing Rule 702). Stated differently, "the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citation omitted). Though an expert must "testify to something more than what is obvious to the layperson in order to be of particular assistance to the jury," *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001), the expert need not have an opinion on the ultimate issue to be decided by the trier of fact. *Smith*, 215 F.3d at 718.

Peoples raises several objections regarding the relevancy of Underwood's opinions. These include: (1) the foreseeability of the ARS market crash; (2) the use of publicly available information to evaluate the investment risks of ARS; (3) Defendants'

---

[1] The court also notes that although the reliability requirements are not lessened, the risk of prejudice from improper expert testimony is not as great here as this is a bench trial, not a jury trial. *See Mintel Int'l Group, Ltd. v. Neergheen*, 636 F. Supp. 2d 677, 682-83 (N.D. Ill. 2009) (stating "the judge in a bench trial may choose to allow the presentation of borderline testimony, subject the testimony to the rigors of cross-examination, and decide later whether the testimony is entitled to some consideration or whether it should be excluded as irrelevant, unreliable, or both"); *see also In re Salem,* 465 F.3d 767, 777 (7th Cir. 2006) (noting that if "the gatekeeper and the factfinder are one and the same -- that is, the judge -- the need to make . . . decisions [on expert testimony] prior to hearing the testimony is lessened" (citation omitted)).

policies and procedures compared with customs and practices in the financial services industry; and (4) Peoples' status as an "institutional investor."

### a. Foreseeability of ARS market crash

Peoples argues that the foreseeability of the ARS market crash is not relevant because no scienter requirement exists under the Indiana Securities Act; thus, Defendants' intent is not at issue. Peoples cannot cry foul of Defendants' failure to warn of an impending market crash -- and all of the market's characteristics which allegedly should have tipped them off to the impending crash, such as auction failures and broker-dealers bidding – and then claim the foreseeability of such events is not relevant. Instead, the foreseeability of the market crash goes towards the materiality of the alleged misrepresentations and omissions, which are essential elements to a statutory claim under the Indiana Securities Act and a common law claim of constructive fraud. *See* Ind. Code 23-19-5-1 (finding it unlawful for a person in connection with the offer, sale or purchase of a security to "make an untrue statement of a material fact or to omit to state a material fact"); *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996) (listing elements for constructive fraud under Indiana law, including the "making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists").

Although Peoples argues that its claims do not rest on the failure to disclose the likelihood of a market collapse, the alleged omissions and misrepresentations are central to the fall of the market and whether anyone could foresee this outcome. Further, the fall of the market resulted in the illiquidity of the ARS market which is at the crux of

Peoples' claims. As a result, information on the likelihood that this market would fall may assist the fact finder in determining not only whether misrepresentations or omissions were made, but also whether they were material. Accordingly, this information is relevant to both claims.

### b.   Publicly Available Information

#### i.   Indiana Securities Act

Next, Peoples argues that to the extent Underwood's Report is based on publicly available information, it is not relevant to the claim under the Indiana Securities Act, because the Indiana Securities Act does not impose a duty to investigate. *See Kelsey v. Nagy*, 410 N.E.2d 1333, 1336 (Ind. Ct. App. 1980). Underwood may not rely on publicly available sources to determine whether disclosures made to Peoples were sufficient to alert them of any material misrepresentations or omissions. Because opinions based on public information do not assist the fact-finder in deciding whether Defendants' actual disclosures were sufficient, Underwood's opinions based on publicly available information will not be considered for the Indiana Securities Act claim.

#### ii.   Constructive Fraud

On the other hand, publicly available information will be relevant to Peoples' reasonableness in relying on alleged misrepresentations and omissions in its constructive fraud claim. Under Indiana law, a claim for constructive fraud requires reliance on an alleged misrepresentation to be reasonable. *McWaters v. Parker,* 995 F.2d 1366, 1372 (7th Cir. 1993). To demonstrate reasonable reliance, the plaintiff must show not only that he in fact relied on the misrepresentations, but also that he had a right to rely on them. *Id.*

13

Indeed, the "legal obligation that a person exercise the common sense and judgment of which he is possessed is a practical limitation on the actionability of various representations. In the course of daily interaction and business dealing, the average person encounters a barrage of opinions, advice, advertisements, estimates, and even 'guestimates.' He simply cannot believe, or rely upon, everything he is told." *Plymale v. Upright*, 419 N.E.2d 756, 762 (Ind. Ct. App. 1981). Here, it is important whether the information available to Peoples was sufficient for it to independently evaluate the investment risk of ARS. Thus, Underwood's opinions dealing with public information should be considered for the constructive fraud claim.

                                                              c.       **Policies and Procedures Compared to Customs and Practices in Financial Services Industry**

Peoples also argues that whether Defendants' policies and procedures were consistent with the customs and practices in the financial services industry is not relevant to any of the claims here. Though Peoples included Defendants' training of employees in the background information of the Complaint, no cause of action exists regarding the failure to adequately train employees. Defendants argue this testimony is relevant to establish the scope of Defendants' relevant duties, but the scope of their duties is defined by Indiana law, not by the industry. *See* Ind. Code 23-2-1-12 (listing violations in connection with the offer, sale, or purchase of a security) (now codified at Ind. Code 23-19-5-1). Thus, whether Defendants' disclosures complied with the customs and practices in the securities industry does not assist the fact finder in deciding whether there were any material omissions or misrepresentations pursuant to the Indiana Securities Act or

constructive fraud claims. Indeed, if there were a system-wide failure of disclosures in the securities industry, then all broker-dealers would be absolved for any omissions or misrepresentations when compared to the industry standard. That cannot be the standard by which they are judged. Accordingly, whether Defendants' policies and procedures were consistent with others in the industry is not relevant and must be excluded.

### d. Peoples status as an "Institutional Investor"

Finally, Peoples objects to Underwood's repeated reference to Peoples as an institutional investor rather than a retail (or individual) investor, as the Indiana Securities Act does not make any distinction between the ability of an institutional investor and the ability of a retail/individual investor to recover for a violation of the Act. *See* Ind. Code § 23-2-1-1(h) (defining "Person" as including an individual, a corporation, a limited liability company, or any other legal or commercial entity) (now codified at Ind. Code § 23-19-1-2(20)). Defendants neither cited contrary case law in their summary judgment papers nor addressed this issue in their response. Thus, since the Indiana Securities Act does not treat institutional investors and retail investors differently, Underwood is precluded from making any distinctions between them for purposes of that claim, and to the extent Underwood alters his analysis based on Peoples' status as an "institutional investor," this must be excluded.

### B. Rule 704

#### 1. Impermissible Legal Conclusions

Even if Underwood's opinions are deemed admissible under Rule 702, Peoples maintains that the following opinions are inadmissible legal conclusions:

- Defendants "complied with all applicable securities industry laws, rules and regulations . . . in all material respects."

- Disclosures made by the Defendants "complied with applicable securities laws, rules and regulations . . . . in all material respects."

- Defendants did not make any material misstatements of fact.

- There were no omissions of material fact.

(Underwood Report at 8-9, 17-18). Defendants contend that expert testimony about compliance with the securities industry regulatory framework is appropriate and the opinions address the ultimate factual issues in the case as to whether there was a duty to disclose allegedly omitted information or whether disclosures were accurate.

Rule 704(a) states that "[a]n opinion is not objectionable just because it embraces an ultimate issue." But that does not mean all opinions concerning ultimate issues are admissible, just that an opinion is not objectionable solely because it embraces an ultimate issue. *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.,* 1:05-cv-207, 2007 WL 1850858, at *8 (N.D. Ind. June 25, 2007). Thus, an expert opinion on the ultimate issue is inadmissible if it violates any of the Federal Rules of Evidence. *Id.*

Pursuant to Rule 702, opinions concerning the ultimate issue are inadmissible if they do not "assist the trier of fact." *Id.* (citations omitted). Opinions that amount to legal conclusions do not assist the trier of fact because they "merely tell the jury what result to reach . . . ." *Id.* (citing FED. R. EVID. 704, 1972 advisory committee's note); *see also Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir.

16

2003) (stating "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"). For example, the Seventh Circuit upheld a district court's exclusion of proffered expert testimony where it was based "on purely legal matters and made up solely of legal conclusions, such as conclusions that the city's actions violated the [statute]." *Good Shepherd*, 323 F.3d at 564. Similarly, a proposed expert opinion that a party had a "special relationship" with another party and accepted "additional duties" was deemed an inadmissible legal conclusion because whether the relationship existed was a question of law for the court. *Superior Aluminum*, 2007 WL 1850858, at * 9; *see also Estate of Gee v. Bloomington Hosp.,* 1:06-cv-00094, 2012 WL 591459, at *2 (S.D. Ind. Feb. 20, 2012) (precluding expert from testifying that defendants acted with "deliberate indifference" because it was a legal conclusion).

Here, Defendants maintain that Underwood is not testifying about the ultimate legal conclusions but instead how their actions related to the securities industry's regulatory framework. Defendants' purported "compliance with the securities industry regulatory framework" is analogous to the standard of care in the industry, which experts are generally permitted to address. *See, e.g., Pless v. Cleveland Wrecking Co.,* 01-cv-0792, 2006 WL 2690074, at *3 (W.D.N.Y. Sept. 18, 2006) ("An expert may testify concerning the ordinary practices within an industry so as to enable the jury to evaluate a defendant's conduct against the standards of accepted practice"). But Underwood's opinions suggest that Defendants' behavior conformed with the legal standard of care, not the securities industry's standard of care, as the opinions are couched in legal terminology. *See Superior Aluminum*, 2007 WL 1850858, at * 10 (using similar rationale

17

in determining opinions were legal conclusions). Particularly, Underwood concludes that: Defendants "*complied with all applicable securities industry laws, rules and regulations* . . . in all *material* respects"; disclosures by Defendants were "full, fair, complete, not misleading, and *complied with applicable securities laws, rules and regulations* . . . in all *material* respects"; Defendants did not make any *material misstatements* of fact; and "there were no omissions of any *material facts*." (Underwood Report at 8, 17-18) (emphasis added).

These opinions embrace legal conclusions and usurp the trier of fact's role. They state that Defendants' actions did not violate any laws or regulations but instead its disclosures were sufficient in all material respects. As a result, these opinions do not guide the fact-finder on the ultimate issue; rather, they tell the fact-finder what the verdict must be. This does not assist the trier of fact. *See Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process"). Accordingly, Underwood's impermissible legal conclusions noted above are excluded.

### III. Conclusion

The court finds that Underwood is qualified to give an opinion in this case subject to the limitations set forth above. Accordingly, Peoples' motion to exclude the expert testimony of Brian C. Underwood (Docket # 111) is **DENIED IN PART** and **GRANTED IN PART.**

**SO ORDERED** this 14th day of March 2013.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.